UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
CERTIFIED SALES, INC.,                      )
                                            )
       Plaintiff,                           )
                                            )
       v.                                   )   Civil Action No. 09-11769-DJC
                                            )
THE STANDARD FIRE INSURANCE                 )
COMPANY,                                    )
                                            )
       Defendant.                           )
                                            )
_____)

## **MEMORANDUM AND ORDER**

**CASPER, J.**                                                                    September 30, 2012

### I.    Introduction

       Plaintiff Certified Sales, Inc. ("Certified Sales") has filed this lawsuit against the Standard Fire Insurance Company ("Standard Fire") for Standard Fire's refusal to indemnify it for losses incurred when Certified Sales settled a dispute with buyers of a salvaged motor yacht. Certified Sales asserts claims against Standard Fire for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), breach of fiduciary duty (Count III), and violation of Mass. Gen. L. c. 93A for unfair or deceptive business practices (Count IV). Standard Fire has now moved for summary judgment as to all claims and as to Certified Sales' demand for attorneys' fees allegedly incurred in settling a lawsuit with the buyers of the salvaged vessel. Certified Sales opposes that motion and has cross-moved for summary judgment, claiming that the spoliation of certain evidence in this case entitles it to judgment in its favor. For the reasons stated below, Standard Fire's motion for summary judgment is DENIED as to

1

Counts I and II and attorneys' fees and GRANTED as to Counts III and IV.  Certified Sales' cross-motion for summary judgment is DENIED.

## II.   Background

The following undisputed facts are taken from the parties' statement of material facts, D. 31, 37.[1]

### A.   Sale of the Salvaged Vessel

Certified Sales is a Massachusetts corporation that marketed, advertised and sold salvaged marine vessels.  ¶ 1.  Standard Fire is a Connecticut corporation that insured vessels.  ¶¶ 4, 5.  In early 2006, Certified Sales was virtually the only entity that Standard Fire used to liquidate its salvaged vessels.  ¶ 41.  One of the vessels insured by Standard Fire was a 68' Hatteras motor yacht called the Bydand (the "yacht" or "Bydand").  ¶ 6.  The Bydand was damaged when it was partially submerged during an accidental sinking on or about November 27, 2005.  ¶ 6.  As part of the salvage process after its sinking, Standard Fire engaged Todd Schwede of Todd & Associates Inc. Marine Surveyors & Claims Settling Agents, who surveyed the yacht and wrote a survey report (the "Schwede Report") dated December 27, 2005.  ¶ 6.  The Schwede Report states, in relevant part:

> [After the sinking] [t]he vessel was, subsequently, rigged with air bags, and raised, refloated, and de-watered. . . . [The yacht] was successfully towed to the Balboa Shipyard, located in Newport Beach, California, for further mitigation efforts.
>
> Following delivery of the vessel to Balboa Shipyard, the vessel was completely steam cleaned, dehumidified and dried, and the port and starboard engines flushed, properly pickled and preserved, resulting in multiple oil changes and subsequent operation to operating temperature."

¶ 17 and D. 31 ex. E.

---

[1] Except where noted, paragraph references correspond to the synchronized numbered paragraphs found in D. 31 (Standard Fire's Concise Statement of Facts), D. 37 (Certified Sales' Response to D. 31 and Statement of Additional Facts), and D. 46 (Standard Fire's Response to D. 37).

On January 30, 2006, Standard Fire hired Certified Sales to market, advertise and sell the salvaged Bydand.  ¶ 7.  To facilitate the sale of the yacht, Standard Fire transferred the Bydand's title to Certified Sales.  D. 1 ¶ 6; D. 5 ¶ 6.  There was no written agreement between the parties, but in consideration of Certified Sales' services, Certified Sales was to receive 10% of the sale price of the salvaged yacht.  ¶ 8, 9.

Standard Fire gave a copy of the Schwede Report to Certified Sales employee Timothy Blanchard ("Blanchard").  ¶¶ 3, 16.  Schwede believed that the yacht could run on its own power from Balboa Marina to San Diego, ¶ 52, and may have shared his opinion with Blanchard, D. 31 ex. H; D. 37 ex. A at 40.  In preparing to sell the Bydand, Blanchard drafted a "description" of the yacht,  ¶¶ 10, 12, as follows:

> The vessel was partially submerged at its berth while the exhaust was off for repairs.  She was refloated steam cleaned new the engines reassembled pickled and run extensively.  ~~This vessel will make a nice~~
> Please call RI office for additional details and viewing instructions.

¶ 12 and D. 31 ex. F.[2]  Certified Sales subsequently created a sales advertisement for the yacht and posted it on the website "www.YachtSalvage.com."  ¶ 13.  The listing stated, in part, as follows:

> Actual Condition
> This vessel was partially submerged at its berth while the exhaust was off for repairs.  She was refloated and steam cleaned.  The engines were reassembled, pickled, and run extensively.

¶ 14 and D. 31 ex. G.  No document created by Standard Fire contained the phrase "run extensively," ¶ 18 and the term was "drafted by Certified Sales."  ¶ 19; D. 31 ex. B, at 85:8-10.

On May 31, 2006, Certified Sales accepted an offer from Wesley H. Heinmiller and Alan J. Stameisen (the "Buyers") to purchase the Bydand for $191,000.00.  ¶ 22.  Pursuant to the

---

[2] The parties do not dispute the language from the actual exhibit, but misstate it, in immaterial ways, in their respective statements of facts.  Compare ¶ 12 with D. 31 ex. F.  Accordingly, the Court here uses the language from the exhibit.

3

agreement between Certified Sales and Standard Fire, Certified Sales retained $19,100.00 of the purchase price as a commission, $332.50 in miscellaneous fees and forwarded the balance to Standard Fire. ¶ 24. Sometime after purchasing the Bydand, which the parties agree occurred approximately six months after the sale, the Buyers contacted Certified Sales regarding the poor condition of the yacht's engines. ¶ 25. Standard Fire instructed Schwede to visit the Bydand with the Buyers' attorney and to report back to the company with a report on its condition with a copy of the report to go to Certified Sales. ¶¶ 25, 45, 46. On September 18, 2006, Schwede, the Buyers, and the Buyers' attorney inspected the Bydand. ¶ 26.

### B.     Buyers of the Salvaged Vessel Sue Certified Sales

On February 7, 2007, after the inspection, the Buyers filed a three-count complaint against Certified Sales in state court in California alleging fraud and deceit by concealment, intentional misrepresentation and negligent misrepresentation. ¶ 28; D. 31 ex. J(C). The Buyers' complaint against Certified Sales alleged, in relevant part, that:

> 10. During or prior to February 2006, [the Buyers] saw an advertisement for the [Bydand] (the "Advertisement"). The Advertisement disclosed that the [Bydand] had been "partially submerged at its berth," but that the engines had been "reassembled, pickled, and run extensively." . . .
>
> 11. By advertising to the public that the engines had been "run extensively" after the sinking or submersion of the [Bydand], [Certified Sales] represented such information as true and correct to the public, including [the Buyers], though in fact, this statement was not true.
>
> 12. Plaintiffs reasonably believed that the engines of the [Bydand] had been properly repaired after the sinking or submersion of the yacht because [Certified Sales] represented in the Advertisement that the engines had been "run extensively."
>
> 13. Relying solely upon the information provided in the Advertisement, [the Buyers] expressed an interest to Defendants for the possible purchase of the [Bydand]. . . . [Certified Sales] advised [the Buyers] that potential purchasers of the [Bydand] would be prohibited from conducting any detailed inspection or tests of the [Bydand] beyond a simple walk-through of the yacht at its location in Southern California. . . .

> 14. Relying solely upon the simple walk-through of the [Bydand] and upon the information provided in the advertisement, including the fact that the yacht's engines had been 'reassembled, pickled, and run extensively,' [Buyers] submitted an offer to purchase the [Bydand].
>
> . . .
>
> 16. After accepting delivery of the [Bydand] from [Certified Sales], [the Buyers] conducted their first detailed inspection of the [Bydand]. They discovered various defects at that time, including but not limited to, damage to the engines . . . which rendered the [Bydand] totally inoperable. Upon further investigation, [the Buyers] were informed and believe that the engines required major repair work at an estimated cost of between $90,000.00 and $100,000.00.
>
> 17. [The Buyers] are informed, believe, and thereon allege, that the Engine Damage occurred as a result of the sinking . . . of the [Bydand] prior to their purchase, but that the Engine Damage would have been prevented if in fact the engines had been "run extensively" after the salvage of the [Bydand], as claimed by [Certified Sales] in the Advertisement.
>
> 18. The Engine Damage was not discoverable through the limited inspection allowed by [Certified Sales] to prospective purchasers of the [Bydand] prior to the sale . . . .

¶ 28; D. 31 ex. J(C). On March 6, 2008, Certified Sales agreed to settle the Buyers' claims for $70,000. ¶ 31. On October 21, 2009, Certified Sales filed this action seeking indemnification for the $70,000 settlement and $40,000 in alleged attorneys' fees it incurred in defense of the suit brought by the Buyers. D. 1.

### C.   Spoliation of Schwede's File[3]

Certified Sales alleges that "[t]he liability of Certified Sales to [the Buyers] arose from no fault of [Certified Sales], but arose directly from the inaccuracy of the description of the salvaged Vessel's engines in the [Schwede Report]." D. 1 ¶ 28; D. 5 ¶ 28. However, it has provided no evidence that the Schwede Report was inaccurate. Instead, Certified Sales argues

---

[3] Unless otherwise noted, the following additional facts are disputed, but are relevant to the discussion below.

that such evidence could have been found in the file created and kept by Schwede relating to his work for Standard Fire concerning the Bydand.  D. 36 at 11-13; D. 37 ¶ 27.

It is undisputed that Schwede destroyed his file relating to the Bydand in 2011.  ¶ 54; D. 46 ex. C at 52.  Schwede testified that he destroyed his file sometime in the summer as part of a regular purging process and that he was unaware of a continuing dispute between the parties.  D. 46 ex. C at 27.  Certified Sales accuses Standard Fire of failing to notify Schwede that his file would be needed until September 11, 2011, even though Schwede was designated as Standard Fire's expert on December 1, 2010 and this action was filed on October 21, 2009.  D. 37 ¶ 53.

Certified Sales claims that although the file's "contents are unknown," the file could have contained "notes of [telephone] conversations" and "oil sample test reports" that may have been taken during the salvage of the Bydand.  D. 36 at 11-12.  At his October 28, 2011 deposition, Schwede testified that he was never given oil sample results, did not know if oil samples were taken, and did not recall discussing oil samples with anyone.  D. 46 ex. C at 42-43, 51.  When pressed as whether it was possible that Schwede had spoken with anyone about oil samples, he testified that it was "unlikely" and that while "anything is possible," any oil sample results would have been attached to the Schwede Report.  D. 46 ex. C at 42-43.

### III. Standard of Review and Burdens of Proof

In deciding a motion for summary judgment, the Court does not decide a factual dispute, but rather determines if a dispute of material facts exists.  <u>Briggs v. Kerrigan</u>, 431 F.2d 967, 968 (1st Cir. 1970).  Summary judgment is appropriate where there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment on a given issue as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  An issue is "genuine" if "the evidence about the fact is such that a reasonable jury could

resolve the point in favor of the nonmoving party," and a fact is "material" if it is "one that might affect the outcome of the suit under the governing law." Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir. 2006).

The party opposing summary judgment "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1995)). While the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009), the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" Tropigas de P.R., Inc., 637 F.3d at 56 (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)).

**IV.   Discussion**

    **A.   Standard Fire Is Not Entitled to Summary Judgment as to the Counts Alleging Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**

        *1.   There is a Disputed Issue of Fact Regarding Any Right of Certified Sales to Seek Indemnification From Standard Fire*

Certified Sales alleges that Standard Fire was contractually bound to indemnify it for its liability to the Buyers. D. 1 ¶ 30. Standard Fire argues that "[t]o the extent any contractual obligation to indemnify should be implied, it runs from Certified Sales to [Standard Fire], not the other way around." D. 30 at 12. Under Massachusetts law, "a contract-based right to indemnification exists only if there is a binding contract between indemnitor and indemnitee in which such right is expressed or from which it can be fairly implied." Kelly v. Dimeo, Inc., 31 Mass. App. Ct. 626, 628 (1991).

7

Here, although there was no written contract laying out all of the terms of the parties' arrangement, the parties agree that they had an ongoing and existing relationship, D. 37 ¶ 41; D. 46 ¶ 41, and that Standard Fire "hired" Certified Sales and initiated the transaction to market the Bydand by sending Certified Sales a "salvage referral form," D. 31 ¶ 7; D. 37 ¶ 7. The parties agree that the terms of the transaction included that Certified Sales would handle the marketing and sale of the Bydand, D. 31 ¶ 7; D. 37 ¶ 7, that Standard Fire would transfer title to the Bydand to Certified Sales to facilitate a future sale, D. 1 ¶ 6; D. 5 ¶ 6, that funds received in the sale would be initially retained by Certified Sales and then, after commission and expenses were deducted, forwarded to Standard Fire, D. 31 ¶ 24; D. 37 ¶ 24, and that "in consideration of [its] services," Certified Sales would earn a 10% commission for its work, D. 31 ¶ 8; D. 37 ¶ 8. The parties agree that there was never any express indication in any form that Standard Fire would indemnify Certified Sales. D. 31 ¶ 34; D. 37 ¶ 34.

Where there is no express indemnification, Massachusetts law "recognize[s] an implied right to contractual indemnity only when there are 'special factors' surrounding the contractual relationship which indicate an intention by one party to indemnify another in a particular situation." Fall River Hous. Auth. v. H.V. Collins Co., 414 Mass. 10, 14 (1992). These "special factors" focus on "the nature of the relationship between the parties." Id. (quoting Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d 1, 2 (1st Cir. 1982)). While these factors have never been clearly enunciated, the inquiry is plainly fact-intensive. See Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 158 (1983) (holding that provision to indemnify was implied in agreement between town and police, where police provided protection at a fireworks display, and where a spectator close to the display was injured and sought damages from town); Great Atl. & Pac. Tea Co. v. Yanofsky, 380 Mass. 326, 331-

8

332 (1980) (holding that provision to indemnify was implied in agreement between lessor and lessee, where lessor promised to repair premises but did not do so, and where an invitee of the lessee was later injured due to unrepaired premises); E. Amanti & Sons, Inc. v. R.C. Griffin, Inc., 53 Mass. App. Ct. 245, 258 (2001) (holding that no provision to indemnify existed in agreement between town and contractor, where there were no "special factors" in relationship between client town and vendor contractor, where contractor sought indemnity for a third party's damages).

But Massachusetts has also long recognized that "[a]n agent who has incurred a liability or sustained a loss in properly executing the instructions of his principal has a right to look to the latter to exonerate him from such liability or reimburse him for the loss." Central Trust Co. v. Rudnick, 310 Mass. 239, 246 (1941); see Evans, Coleman & Evans v. Pistorino, 245 Mass. 94, 99 (1923). This concept fits squarely within more modern precedent directing a court to examine the "nature of the relationship between the parties," Araujo, 693 F.2d at 2, when deciding if an implied right to indemnification is available.

The parties here debate the nature of their relationship, with Certified Sales claiming to have acted as the agent of Standard Fire and Standard Fire admitting only that it engaged Certified Sales as a "third-party contractor to market and sell the salvaged vessel." D. 1 ¶ 5; D. 5 ¶ 5; D. 30 at 17 n.4. "Whether one has acted as an agent is ordinarily a question of fact." Pedersen v. Leahy, 397 Mass. 689, 691 (1986). See also Cable Mills, LLC v. Coakley Pierpan Dolan and Collins Ins. Agency, Inc., 82 Mass. App. Ct. 415, 421 (2012) (quoting Restatement (Second) of Agency § 2 (1958) ("An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He

may or may not be an agent"). While "summary judgment is proper [as to agency] where proof of an essential element of a party's claim 'is unlikely to be forthcoming at trial,'" Spencer v. Doyle, 50 Mass. App. Ct. 6, 8 (2000) (quoting Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 809 (1991)), here the limited facts presented to the Court make it inappropriate to resolve this matter on summary judgment. Here, there are few facts in the record regarding the level of control that Standard Fire could exercise over Certified Sales (e.g., the oversight and supervision in responding to Buyer's claims, and the oversight and supervision in marketing and selling the yacht), and, and the facts that do exist are disputed. See, e.g., D. 37 ¶¶ 43-44; D. 46 ¶¶ 43-44.[4]

Furthermore, Standard Fire "assumes for purposes of this Motion [for Summary Judgment] only that a principal-agent relationship existed between [Standard Fire] and Certified Sales." D. 30 at 17 n.4. To the extent that this "assumption" acts as a concession, it would remove what would otherwise be a disputed fact as to the nature of the parties' relationship for the purposes of summary judgment. But that concession would also create the possibility of an implied right for Certified Sales to seek indemnification from its principal under the terms of the parties' business arrangement, should Certified Sales have "sustained a loss in properly executing the instructions" of Standard Fire. Central Trust Co. v. Rudnick, 310 Mass. at 246.

    2. *A Dispute of Material Fact Also Exists As To Whether Certified Sales Accurately Advertised The Yacht*

Even assuming an agency relationship, at least one disputed material fact still remains as to whether Certified Sales "properly execute[d] the instructions of [its] principal," Central Trust Co., 310 Mass. at 239, when it advertised the yacht's engines as having been "run extensively." The Buyers alleged that this language in the advertisement by Certified Sales was material to

---

[4] Standard Fire submits a "Service Agreement" from 2008 between the parties. D. 32. The Court does not rely on this agreement where it does not inform the Court of the nature of the parties' relationship in 2006.

their decision to buy the vessel, D. 31 ex. J(C) ¶¶ 10-18, and the creation and meaning of that phrase is also material to whether Standard Fire is liable on Count I and must indemnify Certified Sales.

An agent is not entitled to exoneration from liability for the consequences of an act taken by it that was not authorized by the principal. O'Neill v. Niccolls, 324 Mass. 382, 384 (1949). "[A] party may not obtain indemnification for its own negligence under a theory of implied contractual indemnity." Kelly v. Dimeo, Inc., 31 Mass. App. Ct. 626, 628 (1991) (citing Great Atl. & Pac. Tea Co., 380 Mass. at 334; Rathbun v. W. Mass. Elec. Co., 395 Mass. 361, 363 (1985)).

Certified Sales argues that describing the engines as having been "run extensively" was a reasonable description of the engines based on the representations and materials provided by Standard Fire. D. 35 at 1; D. 36 at 7. Standard Fire responds that this language was a "misrepresentation" of the information it had provided, and notes that there is no question that Certified Sales created this language. D. 30 at 1, 12. If the "run extensively" language was a fair interpretation of the materials provided by Standard Fire, then assuming a principal-agent relationship, Standard Fire could be liable to indemnify Certified Sales, although a further factual determination would likely be necessary. However, if this language was not a fair representation, then all liability may rest with Certified Sales.[5] Accordingly, it is a question of material fact whether "runs extensively" was an accurate portrayal of the condition of the salvaged vessel.

---

[5] Standard Fire asserts that "'run extensively' is an accepted industry term that means that the vessel was sea trialed (operated in open waters) and repeatedly load tested with the vessel pushing its own hull coupled with a comprehensive testing of all systems." D. 31 ¶ 37. Standard Fire submits an affidavit from a purported expert that does not support this conclusion, where it reveals that the expert does not use the term and had not encountered the term before on "pre-purchase Survey[s]," D. 31 ex. O ¶ 9, and where the expert only opines on what the term would mean to him, D. 31 ex. O ¶ 10. The Court does not rely on this affidavit as evidence in deciding the present motion.

Similarly, summary judgment for Standard Fire on this record is not warranted as to the alleged breach of the implied covenant of good faith and fair dealing (Count II). "The covenant of good faith and fair dealing is implied in every contract." Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (citations omitted). "The purpose of the covenant is to guarantee that 'the parties remain faithful to the intended and agreed expectations of the contract.'" Kuchera v. Parexel Int'l Corp., 719 F. Supp. 2d 121, 125 (D. Mass. 2010) (quoting Eigerman v. Putnam Invs., 450 Mass. 281, 287 (2007) (quoting Uno Rests., 441 Mass. at 376)). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc., 441 Mass. at 385. Accordingly, the "requirement of good faith performance is . . . circumscribed by the obligations in the contract." Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Given that the parameters of the parties' contract that would circumscribe the scope of this implied duty is in dispute, summary judgment for Standard Fire is likewise not warranted on this claim. Accordingly, Standard Fire's motion for summary judgment on both Count I and Count II is denied.

### B. Standard Fire Is Entitled to Summary Judgment as to Count III: Breach of Fiduciary Duty

Certified Sales alleges that Standard Fire owed it a fiduciary duty and breached that duty. Fiduciary responsibility arises from an agency relationship, which in turn arises from the "consent by [a principal] to [an agent] that the [agent] shall act on [the principal's] behalf and subject to [the principal's] control." Kirkpatrick v. Bos. Mut. Life Ins. Co., 393 Mass. 640, 645 (1985) (quoting Restatement (Second) of Agency, §1 (1958)). The "supreme characteristic" of

this relationship is that the agent owes a fiduciary duty to the principal. Gagnon v. Coombs, 39 Mass. App. Ct. 144, 154 (1995). The agent's fiduciary relation to its principal means that it owes the principal a "duty of utmost good faith and absolute loyalty." Id. The agent's duty to further the principal's interest above its own is a "fundamental principle of agency and fiduciary law." Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage, 950 F.2d 60, 66 (1st Cir. 1991).

Even if Certified Sales' allegation that it was Standard Fire's agent is true then the fiduciary duty flowed from Certified Sales to Standard Fire and not the other way around. If Certified Sales was not acting as an agent, then there was no fiduciary duty. See, e.g., Fernandes v. Havkin, 731 F. Supp. 2d. 103, 112 (D. Mass. 2010). Certified Sales advances no further argument in support of its position. Standard Fire's motion for summary judgment on Count III is granted.

### C. Standard Fire is Entitled to Summary Judgment as to Count IV: Violation of Mass. Gen. L. c. 93A

Certified Sales alleges that Standard Fire's conduct here rises to the level of unfair or deceptive business practices in violation of Mass. Gen. L. c. 93A. "[A] practice or act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.'" Incase v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007) (quoting Morrison v. Toys "R" Us, Inc., 441 Mass. 451 (2004)). "Which acts will be considered 'deceptive' is less clearly defined in the case law . . . [but] some cases have held that an act or practice is deceptive 'if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.'" Id. (quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980)) (internal quotation marks, citation, and alterations omitted)).

13

Where as here both parties are business entities, the standard for a c. 93A violation may be higher than what it might be otherwise. Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475-476 (1991) (noting that "there may be 'cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business'" (quoting Spence v. Bos. Edison Co., 390 Mass. 604, 616 (1983)); Giuffrida v. High Country Investor, Inc., 73 Mass. App. Ct. 225, 238 (2008) (noting that "businesses seeking relief under [c. 93A] are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct"). In addition, a business entity bringing a c. 93A violation must show a "loss of money or property" due to the "unfair or deceptive act." Mass. Gen. L. c. 93A § 11.

To decide if there has been a violation of c. 93A, the Court "focus[es] on the nature of challenged conduct and on the purpose and effect of that conduct." Mass. Emp'rs Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42 (1995). Here, the alleged conduct consists of Standard Fire "employing Certified Sales to [sell the yacht] as its agent, and then refusing the claim [for indemnification] and demanding indemnity from Certified Sales." D. 1 ¶ 38. The allegation that Standard Fire refused the claim for indemnification merely repeats the claim that Standard Fire breached its contract. See D. 1 ¶¶ 27-30 (alleging breach of an implied warranty of contractual indemnity). "Because a mere breach of contract is not sufficient to establish a violation of 93A, almost any successful 93A claim based in part on a contract violation will be a 'hybrid' with some other bad act." Incase v. Timex Corp., 488 F.3d 46, 57 (1st Cir. 2007); see also Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) ("A simple breach of contract . . . is an insufficient basis for 93A liability."), and cases cited. Here, the only "other bad act" alleged is that Standard Fire sought counter indemnity from Certified Sales. But that action was innocuous, where, as evident from this lawsuit, Certified Sales clearly did not grant the counter

14

indemnity. It is thus hard to see how Certified Sales suffered, from Standard Fire's action, the required "loss of money or property" required by Mass. Gen. L. c. 93A, § 11. Nor when the Court considers these actions in combination is there a practice to support a claim under c. 93A. The sum of the behavior alleged here is "insufficiently egregious to bring the offending party within the statutory objective of punishing truly inequitable marketplace behavior," VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 624 (1994) (citing Manning v. Zuckerman, 388 Mass. 8, 12 (1983)).

Accordingly, on this record, the Court finds nothing that rises to the level of unfairness or deception contemplated by c. 93A. In such a situation it is appropriate to grant summary judgment on the c. 93A claim even where a breach of contract claim is not resolved. See, e.g., Olson v. Sovereign Bancorp, Inc., No. 08-10471-GAO, 2012 WL 642543, at *4 (D. Mass. February 28, 2012) (granting defendant's motion for summary judgment on 93A but denying summary judgment as to breach of express and implied contract claims where "the plaintiff's allegations may support an action for breach of contract [but t]here is no evidence in the record to support a finding of especial deception or unfairness"). Also, even as the breach of the implied covenant of good faith and fair dealing claim (Count II) survives, on this record, the Court concludes that the c. 93A claim should not. See, e.g., PH Group Ltd. v. Birch, 985 F.2d 649, 652 (1st Cir. 1993) (ruling that there was no inconsistency between verdict of breach of implied covenant of good faith and fair dealing and judgment that defendant did not violate c. 93A, and noting that violations of c. 93A "must meet a higher standard of liability than do breaches of an implied covenant of good faith and fair dealing"). Standard Fire's motion for summary judgment on Count IV will be granted.

### D. Certified Sales is Not Entitled to Summary Judgment As the Result of Spoliation

Certified Sales now moves for summary judgment on all counts because of the spoliation of Schwede's file. Spoliation is an evidentiary issue and in this circuit, courts generally consider multiple factors before even imposing a lesser sanction than complete dismissal of a lawsuit. See, e.g., Chapman ex rel. Estate of Chapman v. Bernard's Inc., 167 F. Supp. 2d. 406, 413-414 (D. Mass. 2001) [hereinafter Chapman] (considering prejudice, ability to cure, practical importance of spoliation, bad faith, and potential for abuse). To penalize a party because of spoliation the facts must at least suggest that those who destroyed the materials did so in "bad faith or . . . consciousness of a weak case." Allen Pen Co., Inc. v. Springfield Photo Mount Co., Inc., 653 F.2d 17, 23 (1981); see also Jackson v. Harvard Univ., 721 F. Supp. 1397, 1412-1413 (D. Mass. 1989) (collecting cases and refusing to draw negative inference where documents destroyed due to mistake). On this record there has been no facial showing of a "purposeful or intentional act on the part of the defendant[] designed to suppress evidence." Jackson, 721 F. Supp. at 1413. Nor is it appropriate on summary judgment for the court to engage in an inquiry to determine if Schwede's intentions in destroying the file were contrary to his testimony that he destroyed the file as part of a regular purge and because he did not know the file would be needed. Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996). Moreover, Certified Sales does not present any evidence to call Schwede's testimony into doubt.

Even assuming that Schwede's file were relevant and its destruction sanctionable, it is also not clear on this record whether the Court should impute the destruction of the file to Standard Fire. See Jackson, 721 F. Supp. at 1412-1413 ("Here, the evidence shows merely that a person . . . who was not under the direct supervision or control of the [the defendant], made a mistake. To impute [the] error to [the defendant] . . . [and declare 'victory for plaintiff'] would

16

be an unduly harsh remedy"). The material facts necessary to make this determination are disputed. D. 37 ¶¶ 53-54; D. 46 ¶¶ 53-54.

Finally, even if some sanction is appropriate, it is clear at this stage in the litigation, on both the contested and uncontested facts, that summary judgment on all claims for spoliation is "far too draconian a sanction." Allen Pen Co., Inc., 653 F.2d 17, 23 (1981). See, e.g., Chapman, 167 F. Supp. 2d at 413-414; National Surety Corp. v. India Tea & Spices, Inc., No. 09-11771-LTS, 2012 WL 1114366 at *1 (D. Mass. April 2, 2012) (rejecting "harsh sanction of dismissal" for spoliation). For these reasons, Certified Sales' cross-motion for summary judgment will be denied.

## V. Conclusion

For the foregoing reasons, the Court DENIES Standard Fire's motion for summary judgment (D. 29) as to Count I and II.[6] The Court GRANTS Standard Fire's motion for summary judgment (D. 29) as to Counts III and IV of the Complaint (D.1). The Court DENIES Certified Sales' cross-motion for summary judgment (D. 39).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[6] Standard Fire also moves for summary judgment against Certified Sales as to $40,000 in attorneys' fees allegedly incurred by Certified Sales in settling its lawsuit with the Buyers. The record before the court suggests that there is a factual dispute as to the attorneys' fees and there is no evidence is in the record as to their exact amount. Two months before the instant motion for summary judgment was filed, Ronald Bethel, the owner of Certified Sales, D. 31 ¶ 2, testified in a deposition that he was making a demand for $40,000 in attorneys' fees. D. 31 ex. B at 90. At that deposition, Standard Fire asked for proof of the fee claim and the status of that request is not now known to the Court. Since the Court is denying summary judgment as to Count I, and if Certified Sales is successful on that claim, it may give rise to a claim for attorneys' fees for the underlying action with the Buyers. Accordingly, the Court denies Standard Fire's motion for summary judgment as to attorneys' fees.